ABBOTT *v.* ABBOTT.

1. DIVORCE—EXTREME CRUELTY—CONDONATION—EVIDENCE.

Although plaintiff had condoned defendant's act in communicating to her a venereal disease, and was thereby estopped from reviving the cause in the absence of subsequent misconduct, nevertheless it was an element competent for the court to consider in weighing their conflicting testimony as to her health and defendant's subse-

See notes in 4 L. R. A. (N. S.) 909; 5 L. R. A. (N. S.) 729; 44 L. R. A. (N. S.) 1003.

quent dissolute tendencies, neglect and loss of affection, and association with women of questionable reputation, supporting the decree of divorce on the ground of extreme cruelty.

2. SAME—ALIMONY—LIEN.

An allowance of $5 per week as alimony, the same being made a lien on defendant's real estate, including a lot standing in their joint names as tenants by the entireties, which by the decree was to vest in and be the sole property of defendant on compliance therewith, he being a young man in robust health and earning $15 a week, *held*, not excessive.

3. SAME—MODIFICATION OF DECREE—DEFAULT.

While it may be questionable whether it is for the best interest of either party to hold unproductive property tied up indefinitely, and a modification of the decree might be advisable on a proper showing of compliance therewith, defendant is in no position to move therein while in default.

Appeal from Kalamazoo; Weimer, J. Submitted April 24, 1918. (Docket No. 68.) Decided September 28, 1918.

Bill by Grace Abbott against Charles A. Abbott for a divorce. From a decree for plaintiff, defendant appeals. Affirmed.

*Harry C. Howard,* for plaintiff.

*Alfred S. Frost,* for defendant.

STEERE, J. On September 16, 1916, plaintiff filed a bill for divorce against defendant in the circuit court of Kalamazoo county charging extreme cruelty and on March 15, 1917, obtained a decree in accordance with the prayer of her bill. The parties to this suit were married on November 21, 1907, in Kalamazoo, Michigan, residing there during their married life together, and separated permanently on September 4, 1916, he going to Detroit where he has since

lived. When they were married she was 23 years of age and he over 21. He was then an electric car conductor, and she living with her parents. No children were born to them. For the first five years of their married life they made their home with her parents he paying rent for their rooms and his own board when there, while she helped her mother in the household and no charge was made for her board. He at times ran upon an interurban line and would then necessarily be away from home nights a portion of the time. In company with other employees of the road he had apartments in Albion, one of the cities on the interurban line, and apparently began a course of fast living which ultimately led to his arrest under a charge of embezzlement and conviction on his plea of guilty, which terminated his career as a railroad employee. He then engaged in the grocery business in Kalamazoo and they set up housekeeping by themselves. He ran a small grocery with indifferent success for about two years and a half, after which he followed jitney driving until he left for Detroit.

Just what means, if any, defendant had at the time they were married is in dispute and not made clear, but when they separated he owned in his own name a lot in Kalamazoo valued at $400, a cottage and lot at a resort nearby on Crooked Lake, valued at $700, standing in his name, but in which he claimed, and plaintiff denied, that his father owned a half interest, and a lot in Kalamazoo valued at $600 standing in both their names as owners by entirety. She had in her possession household effects partly purchased by him and partly given by her parents worth from two to three hundred dollars, and something over $150 of old grocery bills due him from the time he was in that business, of which she claims she was able to collect only between $11 and $12. He claimed to have been in debt about $150 when he left Kalamazoo.

She charges in her bill as grounds of divorce that during their married life he commenced a course of "unkind, harsh, cruel and brutal conduct" consisting of neglect, infidelity, and unkind words and acts when they were together, asserting in harsh language he was not going to longer live with her, etc., until she was finally compelled to and did separate from him in consequence thereof on the 4th day of September, 1916; that in his general conduct he was untrue to his marriage vows, associated with women of doubtful character against her protest, to which he would reply it was "none of her business"; and as a result of his conduct in that regard he contracted and communicated to her a venereal disease which caused her great humiliation, suffering and annoyance, seriously impairing her health.

He filed an answer, with cross-bill asking that a divorce be granted him, denying her charges, except the communication of a venereal disease which he claims was condoned, and charged as ground for the relief asked by him unseemly conduct on her part towards other men, and extreme cruelty in extravagance, idleness, failure to properly care for their home, refusal to live with him, and the fact that she took advantage of a visit by him to Kalamazoo for the purpose of seeing and persuading her to go to Detroit and live with him, to serve papers upon him in her divorce suit, of which she had given him no previous intimation.

It seems evident both from the pleadings and proofs in this case that reconciliation is past possibility. Some carefully worded correspondence between them after he went to Detroit, touching her joining and living with him there, savors too strongly of sparring between them for legal position to call for serious consideration. Both parties ask a decree of divorce, the minor question, at least with defendant, being to which

of them it should be granted, with his major grievance the amount of alimony awarded to her.

The issues are in the main purely of fact, and each of the parties impresses us as testifying in the extreme to the bad qualities of the other. To detail the volume of accusing testimony this record furnishes would be an unwholesome and useless thing, serving no beneficial purpose, but we fully agree with the trial court that defendant has failed to make a case for divorce in his favor against plaintiff, whose good reputation and character in the community appears to be well sustained.

It is urged for defendant as a legal proposition that the communication of a venereal disease to plaintiff, which is not denied by defendant, was condoned through her continuing to live with him in marital relations for some years after she knew the fact, authorities being cited which tend to sustain the general proposition. This standing alone might present a serious question; but the drift of the testimony as a whole tends strongly to show that the wreck of their married relations and resultant estrangement was his inclination to lead a fast life and predilection for women of doubtful morality, as to which her credulity and confidence in him made deception on his part easy until finally his conduct became such that her faith in his rectitude and marital fidelity was shattered, particularly after he engaged in jitney driving.

Plaintiff became afflicted and discovered she had contracted a venereal disease from him about two years after they were married. With and in consequence of this she suffered greatly and ultimately was compelled to undergo a serious surgical operation. She testified that he admitted his condition and the result to her, but claimed he had contracted the disease in the use of a public convenience and was sinless and, until convinced to the contrary, she believed

that they were equally innocent victims of circumstances over which they had no control, suffering together in mutual sympathy. His version is that he had contracted the malady before he was married, and, having undergone five or six months' treatment, was, as he supposed, entirely cured, but it came on him again about the time she developed the same condition, and although he never told her before they were married that he was so afflicted he did so later, but not with the excusing particulars she claimed.

If she, with full understanding of the true facts, forgave the wrong he had done her, accepted the situation, and elected to continue the marriage relations for several years thereafter, it may be conceded that, in the absence of any subsequent misconduct on his part giving new ground for divorce, she might be estopped from reviving the cause she had thus understandingly condoned, but here she claims to have been persuaded by him that he had done no intentional wrong and they alike were innocent sufferers; that, believing him blameless, she accepted their misfortune as he represented it and only continued to live with him until subsequently undeceived, although her health was permanently impaired as a consequence of what then befell her. Her mother testified that defendant at first claimed to be suffering with a laceration of the bladder, but afterwards admitted his true condition and excused it as the return of a pre-nuptial affliction of which he supposed he was cured before marriage; that plaintiff refused to believe he was to blame, felt sorry for him and continued to live with him until their final separation, "because she thought so much of him, you could not make her believe he was to blame."

Rejecting this episode in their domestic relations as a sole or distinct legal ground of divorce because condoned, it nevertheless was at least an element in their

married life competent for the court to consider in weighing their conflicting testimony as to her health and defendant's subsequent dissolute tendencies, neglect and loss of affection for his wronged wife, and charged association with women of questionable reputation. There is abundant competent testimony in the case which, if true, and we are impressed that it is, supports the decree granting a divorce to plaintiff on the ground of extreme cruelty.

The court awarded costs to plaintiff, including an attorney fee of $75 and $18.50 expenses of suit, with alimony in the sum of $5 per week, the same being made a lien on his real estate, including the lot standing in their joint names as tenants by entirety, as to which the decree provides that the title shall, "if said sums are promptly paid, vest in and be the sole property of defendant."

A petition was filed by defendant for modification of the decree as to alimony, which was denied and of which the court said in part:

"The defendant complains of the provisions by the terms of which alimony should be made payable at regular intervals for an indefinite period, and urges upon the court the propriety of an order requiring the defendant to pay a lump sum in lieu of alimony, or a division of the property.

"The defendant is comparatively a young man, in the vigor of life, strong and alert physically and mentally and capable of making a good livelihood for himself.

"The plaintiff is not in robust health and her condition I am satisfied is due, to some extent at least, to a loathsome disease transmitted to her by the defendant.

"The separation of these parties is the result of serious misconduct on the part of the defendant. The plaintiff has just cause for complaint of serious wrongs. She is entitled to substantial aid from him as long as she may be in need of it, in my opinion.

"The property is not of such a character or value

that any division could be made that would admit of that provision for plaintiff to which she is entitled."

We are not prepared to hold this award excessive under conditions shown. It is not unusual to make such charges a lien upon a defendant's real estate. Defendant was earning about $15 a week at the time of the decree and has failed to comply with its requirements. By reason of such unexcused default he is not in an advantageous position to move its modification. It is true, as he contends, that without some modification, no matter what or how promptly he pays, he cannot release the property from the continuing lien for alimony imposed, dispose of or raise money on it even to pay the alimony, nor obtain any benefit from the provision relative to the lot in their joint names eventually becoming his sole property. It may be questionable whether it is for the best interests of either party to hold this unproductive real estate with accumulating taxes thus tied up indefinitely. It would seem possible, if not probable, that a modification of the decree in that particular might be advisable, on a proper showing of compliance with its requirements up to the time of application; but as the case now stands, with defendant in default, we are not prepared to disturb the decree of the trial court.

It will stand affirmed, with costs to plaintiff.

OSTRANDER, C. J., and MOORE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred. BIRD, J., did not sit.